IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SOCIETY INSURANCE, a Mutual
Company and MARY HANSEN,

              OPINION AND ORDER

        Plaintiffs,

              11-cv-301-bbc

    v.

UNITED STATES,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Mary Hansen slipped and fell on a patch of ice in a parking lot owned by defendant United States. Plaintiff Society Insurance paid Hansen's worker's compensation and together they are suing defendant for negligence under the common law and Wisconsin's safe place statute. Wis. Stat. § 101.11. Because plaintiff is suing the United States for monetary damages under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80, the court has jurisdiction. 28 U.S.C. § 1346(b)(1).

The case is before the court on defendant's motion for summary judgment. Dkt. #21. Because the parking lot is not "a place of employment" under Wisconsin's safe place statute and because plaintiffs have identified no negligent acts or omissions by defendant, I will grant defendant's motion for summary judgment.

From the parties' proposed findings of fact, I find the following facts to be material and undisputed.

1

UNDISPUTED FACTS

A. The Parties and Plaintiff Hansen's Injury

Defendant United States has a contract with the state of Wisconsin under which the state is responsible for maintaining the Air National Guard base facilities. Defendant pays for 85% of the expenses incurred by the state for maintenance of the base. The state hired Environmental Control as an independent contractor to perform certain maintenance duties on the Air National Guard base at Truax Field. The base includes approximately 45 facilities.

Plaintiff Mary Hansen was employed by Environment Control of Madison as a maintenance custodial person. From October 2002 until her employment with Environment Control ended in October 2010, plaintiff worked exclusively at Truax Field performing janitorial services in Buildings 500, 401 and 1000 and the entrance guard building. Once a day, she would empty the garbage she collected from the restrooms. Using her personal vehicle, she would take the trash bags to the dumpsters in the southwest corner of the parking lot shared by Buildings 500 and 503.

Around 9:45 a.m. on December 26, 2007, plaintiff placed some trash bags into the trunk of her car and drove to the dumpsters in the parking lot between Buildings 500 and 503. She parked her truck near the dumpsters with its rear end facing them. She noticed immediately a layer of ice on the parking lot between her and the dumpsters, with no way to approach the dumpsters without stepping on the ice. As she was taking the trash bags out of the trunk, she slipped on the ice and fell onto her left side.

2

Master Sergeant Andi Peck was the first responder. As the day shift supervisor for security forces, Peck spent the majority of her work days doing patrol visits on the base. She took over communications with 911 dispatch, giving them directions to plaintiff's location. Peck recalls seeing "spotty areas of ice" in the area where plaintiff fell. Air National Guard firefighters responded within four minutes and civilian paramedics arrived within fifteen minutes. The paramedics transported plaintiff to the University of Wisconsin Hospital, where physicians determined that her left hip was broken. Plaintiff Hansen was unable to return to work for several months and plaintiff Society Insurance paid her worker's compensation benefits under its insurance policy with Environmental Control.

The day of the accident, two of plaintiff's friends went to the base to retrieve her vehicle, which had been left at the site of the accident. When they found her vehicle, they noticed that the parking lot around the dumpsters was icy. They saw no indication that the area had been treated with any type of de-icer, such as salt, sand or liquid de-icer.

### B. Buildings 500 and 503 and their Parking Lot

Building 500 is primarily a medical training facility but also serves as a personnel building for various United States Air Force departments. In December 2007, it housed between 30 and 50 people daily. Building 503 houses security forces, including 15-20 people in December 2007. The parking lot between Building 500 and 503 is on base grounds and title to the property is held by the United States. On a typical weekday in

December 2007, the parking spaces around Building 500 would be 50 to 75% full and the spaces around Building 503 would be around 25% full.

Defendant placed the dumpsters in this lot so that they would be in a central location that was easily accessible and a safe distance from buildings. The dumpsters were meant for general use by the base population, not just the janitorial service. Employees of the civil engineering department would empty the garbage from the non-restroom areas of Building 500 into these dumpsters. Medics working in Building 500 would take trash to these dumpsters when they received large shipments with many boxes for recycling and during "unit training assembly weekends" that were outside the responsibility of the civil engineering department.

### C. Responsibility for Snow and Ice Removal on the Base

Under defendant's contract with the state of Wisconsin, the state's civil engineering unit was responsible for snow and ice removal on the base. They were supervised by Bruce Walker, the superintendent of buildings and grounds for the Wisconsin Department of Military Affairs. Walker supervised eight state employees and no federal employees. Walker went on medical leave on November 17, 2007 and did not act as superintendent from then until his retirement on July 30, 2008. Until a replacement was hired in December 2008, Chief Master Sergeant David Martin, an employee of defendant, was the "acting buildings and grounds supervisor." (Neither side identified Martin's duties as acting supervisor.)

Martin's official job title was base facilities manager. The duties of the base facilities manager included making sure the roads, grounds and properties of the base were maintained "structurally." Senior Master Sergeant Scott Hilbur was the base facilities manager until Martin took over on December 1, 2007. The base facilities manager was the contact person for the maintenance operations performed by the state of Wisconsin employees, including snow and ice removal. His duties did not include using heavy equipment for snow or ice removal. At the time at issue, Martin was spending one to four hours each day walking around the base to attend meetings or resolve issues. Martin was unable to recall whether he was on duty at the base on December 26, 2007.

Martin's superior was the civil engineering commander, who oversees the administrative and routine daily actions of the civil engineering department. As of December 26, 2007, the civil engineering commander was either Lieutenant Colonel Kevin Philpot or Lieutenant Colonel Brian Anders.

A snow removal plan for the base was prepared and approved annually to guide all persons engaged in snow removal and ice control. Walker prepared the plan for the winter of 2007-2008. Around October 2007, a snow committee meeting was held to discuss Walker's proposed plan. The meeting likely included facility managers, building managers, base operations and base maintenance. In attendance were Hilbur, the base facilities manager at that time, and Chief Master Sergeant Andrew Pipping, the primary building custodian of Building 404. The Facilities Board of the base approved the 2007 snow removal plan, Ex. 2, dkt. #16-2, which was in effect on December 26, 2007.

5

Under the plan, state of Wisconsin civilian employees would perform snow and ice removal on the base's streets and parking lots. Id. at 4. State employees would operate snow removal heavy equipment provided by defendant. A leader would be designated for each shift "to direct operations in accordance with the priorities established" by the plan. The lead worker and point of contact was Gary Dahmen, a state employee. Each piece of heavy equipment was assigned to specific areas of the base and each area was assigned a priority. The parking lot between Buildings 500 and 503 was the last area of priority for the "Industrial Tractor with Western Plow 06D185."

In the winter of 2007 (at least until Walker took his medical leave), the ususal start of plowing of the parking lots was 2:00 a.m. Typically, the parking lot between Buildings 500 and 503 was plowed by at least 8:00 a.m. De-icing operations would begin on aircraft taxiways and ramps and afterwards proceed to parking lots and streets with ice on them. A chemical de-icer was applied to aircraft movement areas, streets and parking lot surfaces in December 2007. Abrasives such as sand were not used on the streets or parking lots because they could get into aircraft movement areas and incapacitate the jet engines.

D. Snow and Ice Removal Around Buildings

Under the 2007 snow removal plan, building occupants were responsible for making sure their buildings were accessible, except in Buildings 404, 500 and 1210 where these tasks were assigned to the base civil engineering custodial staff. The building occupants or custodians were responsible for clearing the area around the entrance and a path on the

6

sidewalk from the entrance to the nearest handicapped parking space. For this purpose, defendant provided a snow shovel and approved salt. The building custodian was also responsible for organizing the occupants to make sure the sidewalks were cleared. Building occupants and custodians had no responsibility for maintaining streets or parking lots.

Chief Brian Steffen was the primary building custodian for Building 500 in December 2007. He was "the focal point" for reporting safety hazards or something broken in the building. Tech Sergeant Heather Halverson was the alternate building custodian, which meant she would assume Steffen's role in his absence. Steffen was on leave from his base duties from December 26, 2007 to December 28, 2007. On November 27, 2007, Steffen sent an email to the department heads working out of Building 500 with specific directives regarding responsibility for snow and ice removal. Steffen was usually the first one in and, if he saw ice on the sidewalk or in the Building 500 entrance, he would put salt on it.

Steffan and Halverson had no responsibility for snow and ice removal in the area near the garbage dumpsters in the parking lot between Buildings 500 and 503 where plaintiff slipped and fell. That responsibility fell to the state civil engineering unit.

D. Weather Conditions and Snow Removal Around December 26, 2007

In December 2007, Madison had an "average liquid equivalent" total of 3.63 inches of precipitation. However, there was no measurable precipitation on December 25, 2007 or the morning of December 26, 2007.

The state civil engineering unit keeps time sheets using an Integrated Engineering Management System. The system apparently includes a general code for snow removal, as well as specific codes for particular tasks. According to the records, on December 24, 2007, four state employees spent a total of 27 hours on snow removal associated with "heavy equipment operations." No civil engineering tasks were recorded on December 25, 2007, which was not a duty day for the base. On December 26, 2007, before plaintiff's injury at 9:53 a.m., three state employees spent approximately 13 hours on snow removal using heavy equipment. State employees also spent four hours on snow removal associated with "landscaping grounds maintenance" and four hours on snow removal associated with "equipment maintenance."

In addition, on December 24, 2007, a state employee applied 400 gallons of de-icing agent to the parking lots and streets of the base. No de-icer was applied on the base on December 25, 2007 because of the Christmas holiday. On December 26, 2007, a state employee applied another 16 gallons of de-icing agent to the base parking lots and streets.

### E. Other Incidents in the Winter 2007-2008

Before December 26, 2007, Norman Hansen (no relation to plaintiff) complained to Martin about icy conditions "on the grounds" of the base. Norman Hansen was also an employee of Environment Control. He had constant difficulty with ice on the grounds of Truax Field during that winter. He avers that he made "several verbal complaints to Chief Master Sergeant David Martin about the ice around the buildings I worked in, which

included Buildings 500 and 503, prior to December 26, 2007." Martin responded to one of Norman Hansen's verbal complaints by saying, "What do you expect? It's winter."

In December 2007, Conlee Cox slipped and fell on snow and ice near the main gate entrance to the base. Cox was an employee of the State of Wisconsin Department of Military Affairs. A significant amount of snow and ice was built up in the area where he fell. Cox filed an incident report about this fall. He also avers that he used the dumpsters in the parking lot between Buildings 500 and 503 two to three times a week and the snow and ice around the dumpsters was "bad" in 2007, the worst it had been in more than 20 years.

Plaintiff has identified two other injuries on the base from falling on ice, one on December 26, 2007 in a different location from the place where she fell and another several months later, also in a different location.

OPINION

The Federal Tort Claims Act, 28 U.S.C. §§ 2671-80, provides a limited waiver of the federal government's sovereign immunity, giving federal courts jurisdiction over claims against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b). An "employee of the Government" is defined as any "officers or employees of any federal agency, . . . members of the National Guard . . . and persons acting on behalf of a federal agency." 28 U.S.C. § 2671. However, the statute defines "federal agency" to exclude "any contractor with

9

the United States," so the federal government remains immune from suit for the negligence of independent contractors.  Id.; U.S. v. Orleans, 425 U.S. 807, 813-814 (1976) (federal government immune unless it supervises day-to-day operations). Accordingly, plaintiff has not argued that defendant has direct responsibility for the actions of the state civilian engineering employees and concentrates instead on the actions of members of the Air National Guard.

Under the FTCA, the United States "shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.  Because a claim brought under the FTCA is governed by "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b), the substantive law of Wisconsin governs plaintiffs' negligence claims.

### A. Safe Place Statute

Wisconsin's safe place statute provides that "[e]very employer and every owner of a place of employment or a public building . . . shall so construct, repair or maintain such place of employment or public building as to render the same safe." Wis. Stat. § 101.11(1).  The statute does not create an independent cause of action but, instead, raises the standard of care for negligence. Krause v. Veterans of Foreign Wars Post No. 6498, 9 Wis. 2d 547, 552, 101 N.W.2d 645 (1960).  An employer must maintain its premises as free "from danger to life, health, safety or welfare of employees or frequenters . . . as the nature of the employment, place of employment, or public building, will reasonably permit," Wis. Stat.

§ 101.01(13) (defining "safe"), considering the "nature of the business" and the "manner in which [the business] is conducted." Megal v. Green Bay Area Visitor & Convention Bureau, Inc., 2004 WI 98, ¶ 10, 274 Wis. 2d 162, 170, 682 N.W.2d 857, 861 (quotation omitted).

Even under this heightened standard of care, employers and owners are not insurers for employees and frequenters of their premises and are not required to do everything possible to make their premises more safe. Id. An employer or owner is liable if it has actual or constructive notice that the unsafe condition exists. Strack v. Great Atlantic & Pac. Tea Co., 35 Wis. 2d 51, 54, 150 N.W.2d 361, 362 (1967). A defendant has constructive notice if the "defect or condition has existed a long enough time for a reasonably vigilant [defendant] to discover and repair it," considering "the surrounding facts and circumstances, including the nature of the business and the nature of the defect." Megal, 2004 WI 98 at ¶ 12-13 (citations and quotation omitted).

Defendant argues that the parking lot was not a "place of employment" or "public building" and that defendant lacked actual or constructive notice of the ice around the dumpsters. Plaintiffs concede that the parking lot is not a "public building" under Wisconsin law, Plts.' Opp. Br., dkt. #27, at 9 n.1, but they argue that the entire base is a "place of employment" and that defendant had both actual and constructive notice of the ice.

A "place of employment" includes "every place, whether indoors or out or underground and the premises appurtenant thereto . . . where any person is, directly or indirectly, employed by another for direct or indirect gain or profit." Wis. Stat. §

101.01(11). The Wisconsin Supreme Court has "consistently held that in order to constitute a place of employment . . . a building must be used for a profit-making enterprise. Institutions operated by nonprofit or governmental organizations are not places of employment" for purposes of the Wisconsin safe place statute. Ruppa v. American States Ins. Co., 91 Wis. 2d 628, 639, 284 N.W.2d 318 (1979).

Although municipalities and religious and charitable organizations employ individuals, their premises are not considered "places of employment" when their activities lack a profit motivation. Id. (county arena hosting non-profit horse show); Voeltzke v. Kenosha Memorial Hospital, 45 Wis. 2d 271, 281, 172 N.W.2d 673 (1969) (hospital that reinvested earnings in excess of expenditures); Rogers v. Oconomowoc, 24 Wis. 2d 308, 128 N.W.2d 640 (1964) (city beach); Hoepner v. Eau Claire, 264 Wis. 608, 611, 60 N.W.2d 392 (1953) (municipal baseball field). However, a municipality may be operating a "place of employment" if "the activities carried on were sponsored in whole or in part by the city because of the profit motive." Haerter v. West Allis, 23 Wis. 2d 567, 570, 127 N.W.2d 768 (1964); Leitner v. Milwaukee County, 94 Wis. 2d 186, 191, 287 N.W.2d 803, 805 (1980) (county zoo may be "place of employment" if run for profit, so trial court erred by granting motion to dismiss finding zoo was not "place of employment"); Quesenberry v. Milwaukee County, 106 Wis. 2d 685, 695, 317 N.W.2d 468, 473 (1982) (improper to find no profit motive for county golf course on motion to dismiss).

Defendant has not cited, and my research did not uncover, any Wisconsin cases extending these holdings to the federal government, but the inference is unavoidable.

12

Defendant falls squarely within the Wisconsin Supreme Courts' statutory construction. Defendant is a governmental organization and does not employ anyone at the Air National Guard Base at Truax Field with a profit motivation. Plaintiffs identified no activities on the base performed by defendant with a profit motive.

Plaintiffs cite two federal court opinions holding that a United States Post Office was a "place of employment" under the Wisconsin safe place statute. In American Exchange Bank of Madison, Wisconsin v. United States, 257 F.2d 938, 944 (7th Cir. 1958), the Court of Appeals for the Seventh Circuit held "[t]here can be no question but that the post office in Madison was a place of employment," because it carried on a trade or business on the premises, hosting 1100 post office boxes, employing 75 people and using the space for other federal entities. See also Bean v. United States, 219 F. Supp. 8, 10 (E.D. Wis. 1963) (following American Exchange Bank). However, American Exchange Bank predates Ruppa and Leitner and reached its conclusion without citing any Wisconsin Supreme Court cases and without discussing the "for indirect or direct gain or profit" language. Although I doubt that American Exchange Bank would stand in light of the Wisconsin Supreme Court's subsequent construction of the safe place statute, see Burroughs v. United States, No. 04 C 968, 2005 WL 1793590, *1 n. 1 (E.D. Wis. July 27, 2005) (concluding American Exchange Bank is no longer controlling law), I need not reach that conclusion because plaintiff has identified no for-profit trade or business engaged in by defendant at the Air National Guard Base. The Air National Guard Base and the parking lot between Buildings 500 and 503 was not a "place of employment" under the safe place statute and thus, defendant was not

13

subject to the safe place statute's heightened standard of care. Accordingly, I need not consider whether defendant had notice within the meaning of the statute.

## B. Common Law Negligence

Because defendant is not subject to the safe place statute's heightened standard of care, plaintiffs must establish that defendant was negligent under the common law. To establish common law negligence, plaintiff must show: "(1) A duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury." Rockweit v. Senecal, 197 Wis. 2d 409, 418, 541 N.W.2d 742 (1995).

In Wisconsin, everyone owes a duty "to the world at large," Hornback v. Archdiocese of Milwaukee, 313 Wis. 2d 294, 309, 752 N.W.2d 862 (quoting Palsgraf v. Long Island R.R. Co., 162 N.E. 99, 103 (1928) (Andrews, J., dissenting), whenever it is "foreseeable that his act or omission to act may cause harm to someone." Rolph v. EBI Companies, 159 Wis. 2d 518, 532, 464 N.W.2d 667, 672 (1991) (citation omitted). The defendant breaches this duty of ordinary care if it, "without intending to do harm, does something (or fails to do something) that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property." Alvarado v. Sersch, 2003 WI 55, ¶ 14, 262 Wis. 2d 74, 662 N.W.2d 350 (quoting Wis JI-Civil 1005, following Osborne v. Montgomery, 203 Wis. 223, 242-43, 234 N.W. 372 (1971)). Negligence is typically an issue for the fact-finder, and "summary judgment is uncommon in negligence actions because the court must

be able to say that no properly instructed, reasonable jury could find, based on the facts presented, that [the defendant] failed to exercise ordinary care." Lambrecht v. Estate of Kaczmarczyk, 2001 WI 25, ¶ 2, 241 Wis. 2d 804, 807-08, 623 N.W.2d 751, 755-56.

As the owner of the land, defendant owed a duty of ordinary care to plaintiff Hansen, who was using the parking lot as part of her employment. Shannon v. Shannon, 150 Wis. 2d 434, 443, 442 N.W.2d 25 (1989). It was foreseeable that icy conditions around the dumpsters in the parking lot might cause harm, because the dumpsters were open for general use by base occupants and were known to be used by various people. The parking lot served approximately 70 people and its spaces were reasonably full on an average weekday.

The problem for plaintiffs is that they have not identified any acts or omissions by federal employees that posed an unreasonable risk of harm. Instead, plaintiffs point to various federal employees involved with snow and ice removal and allege in a general fashion that they failed to adequately maintain, control or inspect the base premises to ensure it was free of ice. However, none of these federal employees were responsible for making sure that ice was removed from the parking lot between Buildings 500 and 503 and, even if they had been responsible, plaintiff has not identified any negligent acts or omissions that they committed.

A reasonable jury might infer that the building custodians, Steffen and Halverson, were responsible for snow and ice removal on the sidewalks and entrances around Building 500. However, plaintiffs have no evidence to suggest the building custodians had any responsibility for the parking lot or that they knew or should have known about ice in the

15

parking lot around December 26, 2007. Plaintiffs identify no ways in which Steffen or Halverson failed to reasonably maintain areas within their control.

Martin and Hilbur occupied the role of building facilities manager and Anders and Philpot were their direct supervisors. Several of these management level employees, including Hilbur, either Anders or Philpot and Pipping, the building custodian for Building 404, participated in the development and adoption of the snow removal plan. However, plaintiffs have not argued that the snow removal plan was inadequate. (Consequently, I need not consider whether their decisions about how to allocate resources in the snow removal plan are covered by the "discretionary function" exception for the Federal Tort Claims Act. 28 U.S.C. § 2680(a).) Martin and Hilbur were also responsible for maintaining base facilities structurally, but plaintiffs have offered no evidence that ice accumulated around the dumpsters because the drains or gutters were negligently designed or maintained. Plaintiffs allege only that Martin and Hilbur were responsible for maintaining the grounds, without identifying any negligent maintenance. The mere accumulation of ice is not sufficient to show negligence on behalf of a property owner. Merriman v. Cash-Way Inc., 35 Wis. 2d 112, 117, 150 N.W.2d 472 (1967) (plaintiff unable to prove defectively constructed down spout caused formation of ice on parking lot).

The closest plaintiffs come to alleging negligence by one of defendant's employees is to state that Martin was responsible for supervising snow removal by the state employees in civil engineering unit because he was the acting buildings and grounds supervisor. Plts.' Opp. Br., dkt. #27, at 18. Officially, the building facilities manager was only the contact

person for the state civil engineering unit and did not directly supervise the daily activities of any state employees. The latter responsibility fell to Walker, a state employee and fell to Martin only after Walker went on medical leave, when Martin served as the acting superintendent. Neither side has supplied evidence about Martin's duties in this role. Plaintiffs have not established a genuine disputes about whether Martin supervised the daily activities of these independent contractors, an issue on which they bore the burden of proof.

Even assuming that Martin supervised the state employees, plaintiffs have not identified any negligent acts or omissions committed by the state employees. The record contains a detailed account of the snow and ice removal efforts by the state employees between December 24 and 26, 2007. Plaintiffs have pointed to no shortcomings in the civil engineering unit's efforts. In their proposed finding of facts, plaintiffs note that plaintiff Hansen's friends concluded that no de-icer had been applied to the parking lot. Even if this is true, plaintiffs have made no attempt to argue that failing to apply de-icer to the parking lot on December 26, 2007 posed an unreasonable risk of harm. No precipitation fell on December 25 or 26, 2007, and the state civil engineering unit applied 400 gallons of de-icer to the base's streets and parking lots on December 24. Plaintiffs have not argued that these efforts were inadequate given the weather conditions.

In general, plaintiffs have no evidence that any employees of defendant knew or should have known about the ice in the parking lot shared by Buildings 500 and 503 but failed to take corrective action. Plaintiffs cite the affidavits of Conlee Cox and Norman Hansen to support their argument that defendant knew or should have known about the ice.

17

Cox avers that the ice in the parking lot was the worst he had seen in 20 years. However, Cox was a state employee and he does not aver that he discussed the ice with anyone. Norman Hansen complained about ice "on the grounds" around Buildings 500 and 503, but he does not state that he complained about ice in the parking lot and he does not say when he made his complaints or Martin made his sarcastic reply. Last, plaintiffs asserts that a pattern of slip and falls in the winter of 2007 and 2008 shows that defendant knew about ice problems and failed to take reasonable care to address snow and ice removal on the parking lots of the base. However, plaintiffs identify only four falls, none of which were in parking lots, much less the in the particular parking lot shared by Buildings 500 and 503. Even under the heightened standard of care imposed by the safe place statute, a defendant is not liable unless it has notice of the specific defect. Merriman, 35 Wis. 2d at 116-17.

Plaintiffs cannot prevail on their common law negligence claim by proving only that there was ice around the dumpsters and that plaintiff Hansen slipped on it; they must identify some act or omission by defendant that created an unreasonable risk of harm. They have failed to do so. Accordingly, no reasonable jury could conclude that defendant breached its duty of ordinary care, and I will grant summary judgment in favor of defendant on plaintiffs' common law negligence claim.

ORDER

IT IS ORDERED that defendant United States' motion for summary judgment, dkt. #21, is GRANTED. The clerk of court is directed to enter judgment in favor of defendant

and close this case.

Entered this 12th day of June, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge